**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| M & I Bank, FSB,<br><br>            Plaintiff,<br><br>vs.<br><br>Ty Coughlin et al.,<br><br>            Defendants. | No. CV 09-02282-PHX-NVW<br><br>**ORDER** |

      Before the Court is Plaintiff M&I Bank's motion for partial summary judgment (Doc. 152), Defendants Lawyers Title Insurance Company and Vicki Collier's cross motion for summary judgment (Doc. 120), and Defendants Lawyers Title Insurance Company and Vicki Collier's motion to strike M&I's second amended memorandum of law in support of motion for partial summary judgment (Doc. 162). For the reasons stated below, Plaintiff's motion will be granted as to Defendants Jarnagin, Lawyers Title, and Collier, and the Court will call for further briefing on Plaintiff's claim against Defendant Blue Brick Financial. Lawyers Title and Collier's two motions will be denied.

**I.     LAWYERS TITLE AND COLLIER'S MOTION TO STRIKE**

      Lawyers Title and Collier's motion to strike asserts that M&I's summary judgment brief was filed without Court permission. The currently operative brief — the "Second Amended Memorandum of Law Supporting Motion for Partial Summary Judgment" (Doc. 152) — is technically unauthorized. On October 6, 2011, M&I moved to seal certain exhibits attached to its "Amended Memorandum of Law Supporting Partial

Motion for Summary Judgment" (Doc. 118). Apparently M&I had failed to redact certain information "[d]ue to a clerical error." (Doc. 144.) The Court granted that motion the same day and directed M&I "to refile the exhibits that it wishes to be viewed on the public docket." (Doc. 145.) M&I in turn refiled all exhibits along with the "Second Amended Memorandum of Law Supporting Motion for Partial Summary Judgment" (Doc. 152). This may be due to the fact the Court responded to M&I's motion to seal by sealing M&I's brief and exhibits, rather than just exhibits.

In any event, refiling the brief was not authorized, and it led to the appearance of a summary judgment brief being filed after the opposing party filed a response. Here, however, this was harmless. The refiling was purely to correct technical problems. The Court has compared the second amended brief to the amended brief (and to the original brief, Doc. 110) and has found no difference between them other than meaningless formatting changes. Lawyers Title and Collier have likewise pointed to no difference, much less a difference that would prejudice them. Their motion to strike will be denied and the motion for summary judgment will be considered on its merits.

## II. BACKGROUND

### A. Jarnagin's Land

The following facts are undisputed unless attributed to a party. Defendant James Jarnagin, a mortgage broker for over 15 years, wanted to sell a parcel of vacant land he owned in Mesa, Arizona. In early 2008, Defendant Coughlin saw a "for sale" sign on Jarnagin's lot and contacted Jarnagin to express interest. Jarnagin told Coughlin that the asking price was $285,000, but there was also an annexation fee associated with the lot of between $30,000 and $35,000. Jarnagin said he would sell for $317,000 and cover the annexation fee or he would sell for $285,000 and leave the annexation fee to Coughlin. Coughlin chose the $317,000 option. Jarnagin then referred Coughlin to Defendant Blue Brick Financial, a mortgage brokerage where Jarnagin worked.

### B. Blue Brick's Contract with M&I

Blue Brick had a "Mortgage Broker Settlement Services Agreement" with Plaintiff M&I Bank, in which Blue Brick agreed to take information from loan applicants and perform "settlement services" for M&I. "Settlement services" included, among other things, tasks such as filling out loan applications on behalf of prospective borrowers and gathering supporting documents. The settlement services contract also contained the following "warranty" clause:

> Broker represents and warrants that all information provided to M&I in connection with the submission of an application for a Mortgage Loan, including without limitation the contents of each application, is true, correct and complete and fairly presents the financial condition of the Applicant and does not contain any false or misleading information.

(Doc. 154 at 45.) The contract then went on to describe M&I's remedies if Blue Brick breached, including a cure and repurchase provision:

> Upon discovery . . . of a breach of any of the representations and warranties set forth [above], the party discovering such breach shall give prompt written notice to the other party. [¶] Within thirty (30) days of . . . notice by M&I the Broker shall cure, in all material respects, any such breach or defect; or [¶] [i]f Broker is unable to cure the breach or defect within the cure period, it shall repurchase the Mortgage Loan(s) . . . .

(*Id.* at 46 (section headings omitted).) The repurchase price was specified as the unpaid principal balance of the loan, along with unpaid interest, and any costs or fees incurred by M&I in enforcing its rights. (*Id.* at 47.)

The contract also contained an indemnification clause:

> In addition to the cure and repurchase obligations [above], Broker shall indemnify and hold harmless M&I . . . against any loss, claim, liability, expense, penalty or other damage of any kind . . . incurred by reason of or arising out of or in connection with . . . Broker's breach of any representation, warranty or covenant contained in this Agreement [or] Broker's breach of any provision of this Agreement or failure to perform any obligation required hereunder . . . .

(*Id.*)

### C. Coughlin's Application

On March 8, 2008, Blue Brick submitted to M&I a mortgage application on behalf of Coughlin. The application listed the purchase price at $317,000 and requested a loan for $285,300. Coughlin stated on his application that he would provide "cash from borrower" — *i.e.*, a down payment — of $40,833.70.

Coughlin admitted at a later deposition that much of what he said on the application was not true, including his income, rent information, personal property information, bank balances, and tax returns. One of the only truthful statements on the application was the location of his bank accounts: Wells Fargo and Boeing Employees Credit Union. Coughlin also submitted an IRS form 4506-T, which gave M&I permission to request his tax information directly from the IRS.

M&I approved Coughlin's application and funded and closed the transaction, but the timing of those events is hazy. The note and deed of trust documents which Coughlin eventually signed bore the date March 7, 2008 — one day before he applied for the loan. Apparently these documents had been pre-dated, because Coughlin's signature on the deed of trust was notarized on March 8, 2008 — the same day he applied for the loan.

### D. Transnation and the Cashier's Check

The title company handling the escrow and closing was Transnation Title (predecessor-in-interest to Defendant Lawyers Title Insurance Company). At some point in mid-March 2008 (the exact time is disputed), Transnation received closing instructions from M&I. The closing instructions required Transnation "to notify the Lender of any material fact that might influence the Lender's decision to make the loan." Among the potentially material facts were "contribution of funds by persons other than the borrower" and "if the closing agent discovers that any party to the transaction has made a misrepresentation." In addition, "[i]n the event a cashier's check or similar instrument is presented by the borrower or on behalf of the borrower," the closing instructions required "complete sourcing of the funds to insure the funds belong to the borrower." The instructions further required Transnation to "suspend the closing and obtain written

authorization from the Lender to proceed if the Closing Agent has knowledge that any portion of the down payment is not from the borrower's own funds or a (Lender-approved) bona-fide gift or is deposited by a person other than borrower." Finally, the closing instructions required Transnation to indemnify M&I for losses resulting from Transnation's breach of the instructions. (Doc. 119 at 4.) The Transnation employee responsible for handling the Coughlin-M&I transaction was Defendant Vicki Collier.

On March 11, 2008, Jarnagin says that he went to Transnation and personally delivered a down payment in the form of a cashier's check purchased from Bank of America for $32,518.18. The cashier's check named Coughlin as its remitter (purchaser), but Jarnagin admits that he paid for the cashier's check with his own money. He says he did so because Coughlin changed his mind at the last minute about the annexation fee. Coughlin allegedly no longer trusted Jarnagin to pay off the annexation fee after closing, and insisted that Jarnagin make a down payment equivalent to the annexation fee.

Jarnagin claims that he had a long-standing working relationship with Transnation, and that its employees knew the March 11, 2008 cashier's check represented his money, not Coughlin's. Jarnagin believes that "it was not uncommon for a bank to let a buyer cover a down payment in Phoenix at that time" and "[h]e thought that if someone at a higher level had any problem with the transaction, they would contact him prior to closing, as they had done on past occasions when someone at a higher level wanted some element of a transaction changed." (Doc. 132 at 2.)

For purposes of this summary judgment motion, M&I has not attempted to establish that Transnation knew Jarnagin was the true source of the down payment. But M&I insists that Transnation could have looked at Coughlin's file and seen that he had no Bank of America account. M&I also points out — and Transnation admits — that Transnation took no steps to verify that the cashier's check originated from Coughlin's own money. Instead, on the same day Transnation received Jarnagin's check, it sent M&I a fax stating, "M&I Hud, copy of Buyer[']s Down payment check to follow within 15 minutes." (Doc. 152-10 at 2.)

Later that same day, M&I funded the loan and recorded the deed of trust. Two days later (March 13), Transnation executed the closing instructions. About three weeks later, according to Blue Brick, M&I submitted Coughlin's form 4506-T to the IRS and quickly discovered that Coughlin had falsified his tax information on the loan application. But M&I took no immediate action against Coughlin, perhaps because Coughlin made his first seven payments on the loan, which M&I accepted. Coughlin then defaulted. On May 13, 2009, M&I acquired the property through a trustee's sale credit bid of $125,375.46. M&I claims it later resold the property at a private sale for $10,654.82.

On October 30, 2009, M&I filed this lawsuit against Coughlin, Blue Brick, Jarnagin and his wife (joined for community property purposes), Lawyers Title (as successor-in-interest to Transnation), and Collier. M&I seeks, among other things, economic damages of $289,156.40, which equals the total amount still owed on the Coughlin debt, plus costs of the trustee's sale, minus the $10,654.82 realized at resale. M&I has not factored its credit bid into its damages.

### III.    M&I'S FRAUD CLAIM AGAINST JARNAGIN

M&I requests summary judgment on its eleventh cause of action, a fraud claim against the seller, Jarnagin.

> A claim for fraud requires proof of nine elements by clear and convincing evidence: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it be acted upon by the recipient in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely on it; (9) the hearer's consequent and proximate injury.

*Comerica Bank v. Mahmoodi*, 224 Ariz. 289, 291–92, 229 P.3d 1031, 1033–34 (Ct. App. 2010). M&I has established a lack of genuine dispute over each of these elements.

First, Jarnagin made a representation when he had Bank of America print Coughlin's name in the remitter space on the cashier's check. Second, Jarnagin admits that representation was false. Third, that representation was material. It is at least

"generally known within the territorial jurisdiction of the trial court," Fed. R. Evid. 201(b), if not simple business sense, that the source of a down payment matters to the lender. It especially matters when the down payment comes from the seller because seller-funded down payments are a staple of mortgage fraud. That is why M&I directed Transnation to ensure that the down payment came from Coughlin. Accordingly, Jarnagin made a material false statement when he named Coughlin as the remitter of the cashier's check.

As to the fourth and fifth fraud elements — "the speaker's knowledge of its falsity or ignorance of its truth" and "the speaker's intent that it be acted upon by the recipient in the manner reasonably contemplated" — Jarnagin essentially falls back on his assertions that (i) Transnation knew he was the true source of the cashier's check, and he therefore made no misrepresentation to Transnation, and (ii) he made no misrepresentation directly to M&I.

Jarnagin's defense strains credulity. It should be obvious that one cannot avoid fraud liability by sending a misrepresentation through an intermediary:

> The maker of a fraudulent misrepresentation is subject to liability . . . if the misrepresentation . . . is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the [injured party], and that it will influence his conduct in the transaction or type of transaction involved.

*Restatement (Second) of Torts* § 533 (1977). Jarnagin had every reason to expect that the information on the cashier's check would make its way from Transnation to M&I, and that it would "influence" M&I's conduct. That was the point of delivering the check — without it, M&I would not have closed. And that is the only rational (if dishonest) reason for naming Coughlin as remitter — an expectation that disclosing himself as remitter would scuttle the deal. *See also id.* § 532 ("One who embodies a fraudulent misrepresentation in . . . a negotiable instrument . . . is subject to liability for pecuniary loss caused to another who deals with him or with a third person regarding the article or document in justifiable reliance upon the truth of the representation."). Accordingly,

there is no genuine dispute that Jarnagin knew he made a false representation and intended M&I to act on it.

Jarnagin asserts, however, that a genuine dispute still remains over the last four fraud elements — "the hearer's ignorance of its falsity," "the hearer's reliance on its truth," "the hearer's right to rely on it," and "the hearer's consequent and proximate injury." Jarnagin asserts that M&I "was informed the funds were coming from Bank of America before closing, knew [from Coughlin's loan application] that Coughlin had no account at Bank of America and [still] chose to close." (Doc. 132 at 4 (citations omitted).)

Jarnagin essentially claims, "You could have caught my lie by looking at your own records." There are two problems with this defense. First, Jarnagin has no right to lie and then place the burden of discovering truth on the party to whom he lied. "The recipient of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation." *Restatement (Second) of Torts* § 540 (1977).

Second, the "cursory glance" exception does not apply here. The Restatement explains that "if a mere cursory glance would have disclosed the falsity of the representation, its falsity is regarded as obvious under the rule stated in § 541 [that reliance is not justified where falsity is obvious]." *Id*. § 540 cmt. a. But this exception applies only if "the slightest inspection would have disclosed the defect" and "the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses." *Id*. § 541 cmt. a. The example given by the Restatement is where "one induces another to buy a horse by representing it to be sound [although] the horse has but one eye, [and] the horse is shown to the purchaser before he buys it." *Id*.

Here, M&I would have needed to pull Coughlin's file, recognize that the cashier's check came from a bank at which Coughlin had no account, and then jump to the conclusion that someone other than Coughlin purchased the check. This is much more than "the slightest inspection" (and it is an inspection M&I charged Transnation with

- 8 -

making anyway). Further, endorsing Jarnagin's current argument would convert fortuitous circumstances into a game. In this case, Jarnagin happened to keep his money at Bank of America. If he had kept his money at Wells Fargo or Boeing Employees, he likely would have purchased the cashier's check there, preempting this entire argument. Going forward, however, Jarnagin or other sellers attempting to fund a down payment without lender permission would know they could likely get away with it by purchasing a cashier's check from a bank at which the borrower has no account. Such institutionalized bad faith is anathema to Anglo-American law.

Jarnagin's last defense against summary judgment is that "Transnation Title knew prior to closing that the funds were coming from Jarnagin and Plaintiff is charged with its agent's knowledge." (Doc. 132 at 4 (citation omitted).) Jarnagin offers no legal citations in support of this argument and it is not clear how it would apply in the context of escrow agents, which are agents for both parties to the transaction. *McCormack v. Kirtley*, 115 Ariz. 25, 28, 563 P.2d 280, 283 (1977); *Hoover v. Nielson*, 110 Ariz. 329, 332, 518 P.2d 990, 993 (1974). In any event, the Restatement is to the contrary: "notice of a fact that an agent knows or has reason to know is not imputed to the principal if the agent acts adversely to the principal in a transaction or matter, intending to act solely for the agent's own purposes or those of another person." *Restatement (Third) of Agency* § 5.04 (2006). If a jury found that Transnation employees knew Jarnagin had funded the down payment, then Transnation would have been acting "adversely to the principal in a transaction or matter," either for its "own purposes or those of [Jarnagin]." Accordingly, Jarnagin cannot impute knowledge of his fraud to M&I.

Because there is no genuine dispute over the material facts of fraud liability, M&I will be granted summary judgment on its eleventh cause of action.

### IV. M&I'S BREACH OF CONTRACT CLAIM AGAINST LAWYERS TITLE AND COLLIER

M&I requests summary judgment on its ninth cause of action, a breach of contract claim against Lawyers Title and Collier, based on the theory that Transnation and Collier

breached the closing instructions. Lawyers Title has responded that the loan closed before a contract was formed, and in any event, performance was impossible. Lawyers Title has cross-moved for summary judgment to affirmatively establish the same defenses.

### A. Whether a Contract Existed at the Time of Closing

Lawyers Title argues that it cannot be liable for breach of the closing instructions because Transnation did not execute the closing instructions until March 13, 2008, after M&I had funded the loan and recorded title documents. Notably, however, Lawyers Title has nowhere argued that Transnation did not *possess* the closing instructions on March 11, 2008 — the date it received the cashier's check, and the date M&I funded the loan. If Lawyers Title intended to argue that Transnation did not possess the closing instructions, now would have been the time to do so, along with an explanation of how it managed to close the Coughlin transaction without instructions.

Considering (a) Lawyers Title failed to argue that Transnation did not possess the closing instructions, and (b) no party has accused Transnation of improperly distributing the various monies deposited into its trust account (which would seem likely if Transnation closed without instructions), the only conclusion a reasonable jury could reach is that Transnation possessed the closing instructions but did not execute them until two days after closing.

Failing to execute the instructions does not excuse Transnation from its obligations. "[I]f parties express[] an intent to be contractually bound, they [will] be deemed so bound, even if the requisite formalities of acceptance [are] not explicitly followed." *Ry-Tan Constr., Inc. v. Wash. Elem. Sch. Dist. No. 6*, 210 Ariz. 419, 422, 111 P.3d 1019, 1022 (2005). Performing a contract — here, closing the escrow — is an "express[ion] [of] intent to be contractually bound." Accordingly, there is no genuine dispute that Transnation bound itself to the closing instructions.

### B.      Transnation's Obligation to Source the Cashier's Check

"In the event a cashier's check or similar instrument [was] presented by the borrower or on behalf of the borrower," the closing instructions required Transnation to perform a "complete sourcing of the funds to insure the funds belong to the borrower." Lawyers Title admits this term of the closing instructions and admits that Transnation did not source the funds. But it claims that performance was impossible, and therefore excused.

Lawyers Title specifically relies on the doctrine of legal impossibility: "If the performance of a duty is made impracticable by having to comply with a domestic or foreign governmental regulation or order, that regulation or order is an event the non-occurrence of which was a basic assumption on which the contract was made." *Restatement (Second) of Contracts* § 264 (1981). According to Lawyers Title, the Gramm Leach Bliley Act is the "governmental regulation" that stands in the way. Gramm Leach Bliley makes it unlawful for a financial institution to "disclose to a nonaffiliated third party any nonpublic personal information." 15 U.S.C. § 6802(a). Nonpublic personal information includes information "resulting from any transaction with the consumer or any service performed for the consumer," *id*. § 6809(4)(A)(ii), which presumably would have included a request to Bank of America regarding who purchased the cashier's check. Accordingly, says Lawyers Title, "[t]he 'sourcing' obligation was impossible due to federal regulation, and therefore performance was excused." (Doc. 136 at 6.)

Assuming *arguendo* that Transnation could not have unilaterally verified the source of the cashier's check, it does not prove that sourcing was impossible. Gramm Leach Bliley makes clear that it "shall not prohibit the disclosure of nonpublic personal information . . . with the consent or at the direction of the consumer." 15 U.S.C. § 6802(e)(2). Sometimes this can be done through a three-way call between the bank, the consumer, and the entity seeking to verify the consumer's funds. In this case, it would

not have needed to go that far. Simply asking Coughlin to participate in a three-way call between himself, Bank of America, and Transnation would likely have exposed the deceit, given that Coughlin had no account at Bank of America. Further, Transnation could have required Coughlin to submit a teller's receipt or bank statement demonstrating that he had paid for the cashier's check. In short, Transnation could have employed a number of legally permissible methods to source the cashier's check. M&I has therefore established a lack of genuine dispute over Lawyers Title's and Collier's contractual liability, and is entitled to summary judgment on that claim. Lawyers Title and Collier's cross-motion will accordingly be denied.

## V. M&I'S BREACH OF CONTRACT AND WARRANTY CLAIMS AGAINST BLUE BRICK

M&I requests summary judgment on its third and fourth cause of action, a breach of contract claim and a breach of warranty claim against Blue Brick. The fourth cause of action is really a subset of the third. M&I claims that Blue Brick breached its contract with M&I (hence, the breach of contract claim), and specifically that it breached a warranty clause within the contract (hence, the breach of warranty claim). There is no material difference between these claims and they will be treated together. Nonetheless, the Court requires further briefing on this claim.

Blue Brick claims that M&I executed an IRS form 4506-T three weeks after the Coughlin loan closed, at which point M&I learned that Coughlin had falsified the tax information he submitted with his loan application. Blue Brick has not cross-moved to establish this claim as an undisputed fact. Nonetheless, it "may not be genuinely in dispute," Fed. R. Civ. P. 56(f)(3), given that it derives from not-objected-to deposition testimony from M&I's Rule 30(b)(6) witness.

It is undisputed, however, that M&I accepted seven loan payments from Coughlin. The record does not disclose the timing of these payments, but it is highly unlikely that Coughlin made all seven payments within three weeks of closing. In other words, it likewise "may not be genuinely in dispute" that M&I accepted payments from Coughlin

after it learned of his dishonesty. On its face, then, this would appear to be waiver of M&I's fraud claim against Coughlin. *Edward Greenband Enters. of Ariz. v. Pepper*, 112 Ariz. 115, 117, 538 P.2d 389, 391 (1975) ("an action for fraud is lost if the injured party, after acquiring knowledge of the fraud, manifests to the other party an intention to affirm the contract").

Blue Brick was the broker that originally conveyed Coughlin's false tax information (as well as other false information) to M&I. It is disputed whether Blue Brick knew that the information was false. However, M&I argues on summary judgment that Blue Brick can be contractually liable whether or not it knew the information was false. Specifically, M&I claims that Blue Brick breached paragraph 8(e) of their contract:

> Broker represents and warrants that all information provided to M&I in connection with the submission of an application for a Mortgage Loan, including without limitation the contents of each application, is true, correct and complete and fairly presents the financial condition of the Applicant and does not contain any false or misleading information.

(Doc. 154 at 45.) M&I interprets this language as establishing something like strict liability against the broker for the borrower's dishonesty. Blue Brick disputes this interpretation.

Assuming *arguendo* that M&I's interpretation is correct, the following question arises: If M&I waived Coughlin's fraud, did it also waive its claim against the party charged with preventing the fraud? In other words, can M&I hold Blue Brick to paragraph 8(e) after it learned of Coughlin's fraud and continued to accept his payments? The Court will call for further briefing on this question.

## VI. DAMAGES

All Defendants genuinely dispute material portions of M&I's damages calculation. Despite summary judgment on liability against Jarnagin, Lawyers Title, and Collier, and regardless of the outcome against Blue Brick, a trial on at least damages appears

necessary. Accordingly, the Court cannot enter summary judgment against Jarnagin, Lawyers Title, and Collier as to damages.

M&I should also note that its current damages theory is untenable. M&I asks for the difference between the outstanding debt and the resale price following the trustee's sale. However, M&I took the property at the trustee's sale for a credit bid:

> A beneficiary's credit bid, whether full or partial, is actual payment to the beneficiary to the extent of the bid, just as a cash bid and payment by a non-beneficiary would be. A beneficiary who bids high, drives out other bidders, and takes the property for the amount of its bid may not then say it was not really paid because it paid itself too much.

*M & I Bank, FSB v. Coughlin*, __ F. Supp. 2d __, __, 2011 WL 3489609, at *9 (D. Ariz. Aug. 9, 2011). Accordingly, M&I's damages must be calculated with respect to its credit bid, not the resale price.

IT IS THEREFORE ORDERED that Defendants Lawyers Title Insurance Company and Vicki Collier's motion to strike M&I's second amended memorandum of law in support of motion for partial summary judgment (Doc. 162) is DENIED.

IT IS FURTHER ORDERED that Plaintiff M&I Bank's motion for partial summary judgment (Doc. 152) is GRANTED with respect to its eleventh cause of action (against Defendants James and Janae Jarnagin) and its ninth cause of action (against Defendants Lawyers Title Insurance Company and Vicki Collier), and otherwise remains under advisement.

IT IS FURTHER ORDERED that Defendants Lawyers Title Insurance Company and Vicki Collier's cross motion for summary judgment (Doc. 120) is DENIED.

IT IS FURTHER ORDERED that, by December 2, 2011, Defendant Blue Brick shall submit a brief addressing the following questions:

1. Is there any genuine dispute that M&I executed the IRS form 4506-T three weeks after closing and learned on that same day that Coughlin had falsified the tax information submitted with his loan application?

- 14 -

2. Is there any genuine dispute that M&I accepted at least some payments from Coughlin after the time it learned that Coughlin had falsified the tax information submitted with his loan application?

3. Assume that the answer to questions 1 and 2 is no. Did M&I waive its fraud claim against Coughlin by accepting payments after it learned that Coughlin had falsified the tax information submitted with his loan application?

4. Assume that the answer to question 3 is yes. What is the effect of M&I's waiver on the enforceability of paragraph 8(e) of M&I's contract with Blue Brick?

IT IS FURTHER ORDERED that Plaintiff M&I Bank shall respond to Blue Brick's brief by December 16, 2011, and Blue Brick may reply by January 11, 2012. All briefs shall conform to the page limits set forth in LRCiv 7.2(e)(1)–(2). If necessary, Blue Brick's opening brief and M&I's response brief may attach evidence in addition to what has already been submitted.

IT IS FURTHER ORDERED that oral argument currently scheduled for December 14, 2011, at 1:30 p.m. is VACATED.

Dated this 9th day of November, 2011.

_____
Neil V. Wake
United States District Judge