**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| M & I Bank, FSB,<br><br>            Plaintiff,<br><br>vs.<br><br>Ty Coughlin et al.,<br><br>           Defendants. | No. CV 09-02282-PHX-NVW<br><br>**ORDER** |

Before the Court is Plaintiff M&I Bank's motion for partial summary judgment (Doc. 152), as addressed to Defendant Blue Brick Financial, LLC. The Court previously resolved M&I's motion as to other defendants, but called for further briefing from M&I and Blue Brick. (Doc. 163.) Having received and considered the further briefing, and having heard oral argument, the Court will grant summary judgment in favor of Blue Brick on M&I's contractual causes of action.

Also before the Court are "Plaintiff's Motion in Limine to Exclude All Information, Statements, Purported Evidence of Any Kind That: (1) Plaintiff's Origination, Including Underwriting and its Lending Processes Was the Cause of the Loss; (2) Any Derogatory Comments Concerning the Loan Type or Product; and (3) the Defense of Contributory And/or Comparative Fault" (Doc. 105) and "Plaintiff's Motion in Limine to Exclude the Report and Testimony of Michael Yancey" (Doc. 106). These motions will be denied without prejudice.

## I. BACKGROUND

### A. Jarnagin's Land

The following facts are undisputed unless attributed to a party. Defendant James Jarnagin, wanted to sell a parcel of vacant land he owned in Mesa, Arizona. In early 2008, Defendant Coughlin saw a "for sale" sign on Jarnagin's lot and contacted Jarnagin to express interest. Jarnagin told Coughlin that the asking price was $285,000, but there was also an annexation fee associated with the lot of between $30,000 and $35,000. Jarnagin said he would sell for $317,000 and cover the annexation fee or he would sell for $285,000 and leave the annexation fee to Coughlin. Coughlin chose the $317,000 option. Jarnagin then referred Coughlin to Defendant Blue Brick Financial, a mortgage brokerage where Jarnagin worked.

### B. Blue Brick's Contract with M&I

Blue Brick would eventually take Coughlin's information and submit an application on his behalf to M&I. Blue Brick had a relationship with M&I through a "Mortgage Broker Settlement Services Agreement," a contract governed by Nevada law. (Doc. 154 at 44, 48.)

Through the settlement services agreement, Blue Brick agreed to "take information from [loan applicants], complete their application[s], and perform, at M&I's request, in connection with each approved Mortgage Loan, at least five additional settlement services." (*Id.* at 44.) "Settlement services" included the following:

> 1. Take information from Applicants and fill out M&I's Mortgage Loan application;[1]
>
> 2. Upon Applicants' authorization, obtain Applicants' credit report, analyze the Applicants' income and debt and prequalify Applicants to determine the maximum mortgage that any Applicant can afford;

---

[1] This appears to duplicate the obligation, existing apart from "settlement services" clause, to complete applications on applicants' behalf. No explanation is given.

\* \* \*

> 4. Collect financial information and other related documents in connection with the Mortgage Loan application process;
>
> 5. Initiate or order requests for verifications of employment, deposits and other necessary Mortgage Loan verifications . . . .

(*Id*. at 49.)

The settlement services agreement also contained the following "warranty" clause:

> Broker represents and warrants that all information provided to M&I in connection with the submission of an application for a Mortgage Loan, including without limitation the contents of each application, is true, correct and complete and fairly presents the financial condition of the Applicant and does not contain any false or misleading information.

(*Id*. at 45.) The agreement then went on to describe remedies available to M&I for Blue Brick's breach, including a cure and repurchase provision:

> Upon discovery . . . of a breach of any of the representations and warranties set forth [above], the party discovering such breach shall give prompt written notice to the other party. [¶] Within thirty (30) days of . . . notice by M&I the Broker shall cure, in all material respects, any such breach or defect; or [¶] [i]f Broker is unable to cure the breach or defect within the cure period, it shall repurchase the Mortgage Loan(s) as selected and identified by M&I . . . .

(*Id.* at 46 (section headings omitted).) The repurchase price was specified as the unpaid principal balance of the loan, along with unpaid interest, and any costs or fees incurred by M&I in enforcing its rights. (*Id.* at 47.)

The contract also contained an indemnification clause:

> In addition to the cure and repurchase obligations [above], Broker shall indemnify and hold harmless M&I . . . against any loss, claim, liability, expense, penalty or other damage of any kind . . . incurred by reason of or arising out of or in connection with . . . Broker's breach of any representation, warranty or covenant contained in this Agreement [or] Broker's breach of any provision of this Agreement or failure to perform any obligation required hereunder . . . .

(*Id.*)

### C.     Coughlin's Application

On March 8, 2008, Blue Brick submitted to M&I a mortgage application on behalf of Coughlin. The application listed the purchase price at $317,000 and requested a loan for $285,300. Coughlin stated on his application that he would provide "cash from borrower" — *i.e.*, a down payment — of $40,833.70.

Coughlin admitted at a later deposition that much of what he said on the application was not true, including his income, rent information, personal property information, bank balances, and tax returns. Coughlin also submitted an IRS form 4506-T, which gave M&I permission to request his tax information directly from the IRS.

M&I approved Coughlin's application and funded and closed the transaction in mid-March 2008. On April 3, 2008, M&I submitted Coughlin's form 4506-T to the IRS and quickly discovered that Coughlin had falsified his tax information on the loan application. But M&I took no immediate action against Coughlin, who made his monthly payments in May, June, July, and August. M&I accepted these payments. Meanwhile, M&I was

> [i]nvestigat[ing] the loan file to confirm the misrepresentations, determin[ing], if it could, additional misrepresentations, and investigat[ing] all of the loans submitted by Blue Brick to M&I. These tasks were performed to determine the extent of the risks M&I was facing concerning Coughlin and Blue Brick, in order to make an informed decision as to how to proceed. Ultimately, M&I ceased doing business with Blue Brick and in August 2008, the Coughlin matter was referred to its outside counsel, Smith Dollar PC.

(Doc. 170 at 3.)[2]

---

[2] This description is based on a declaration from an M&I manager familiar with the situation. The declaration was attached to M&I's supplemental response. (Doc. 170.) In supplemental briefing, the parties did not engage in another round of statements of fact, admissions and denials, and so forth. Nonetheless, in Blue Brick's supplemental reply brief, it characterizes M&I's declaration as "uncontested." (Doc. 175 at 4.) The Court therefore treats M&I's description of what it did from April through August 2008

Outside counsel began communicating with Coughlin and Blue Brick about the matter in September 2008. Coughlin made, and M&I accepted, his monthly payments in September and October. During this time and through the end of the year, the parties considered various options to remedy the situation, none of which succeeded. M&I then began trustee's sale proceedings  On May 13, 2009, M&I acquired the property through a trustee's sale credit bid.

## II.   M&I'S BREACH OF CONTRACT AND WARRANTY CLAIMS AGAINST BLUE BRICK[3]

Blue Brick conveyed Coughlin's false tax information (as well as other false information) to M&I. It is disputed whether Blue Brick knew that the information was false. However, M&I argues that Blue Brick can be contractually liable whether or not it knew the information was false. Specifically, M&I claims that Blue Brick breached the settlement services agreement's warranty clause:

> Broker represents and warrants that all information provided to M&I in connection with the submission of an application for a Mortgage Loan, including without limitation the contents of each application, is true, correct and complete and fairly presents the financial condition of the Applicant and does not contain any false or misleading information.

(Doc. 154 at 45.)  M&I interprets this language as establishing something like strict liability against the broker for the borrower's dishonesty. Blue Brick disputes this interpretation.

### A.   Waiver

In reviewing the parties' positions on this dispute, the Court raised — and called for further briefing and argument on — the possibility of whether M&I waived any claim based on the warranty clause by accepting payments from Coughlin after discovering that

---

as an undisputed fact.

[3] As noted in the Court's previous order, M&I's breach of warranty claim is really a subset of its breach of contract claim, and both claims stand or fall together. (Doc. 163 at 12.) The Court therefore analyzes them together.

- 5 -

he had falsified his tax information. The Court analogized to the principle of law that one who learns of a fraud and goes forward anyway loses any claim based on dishonesty. *See*, *e.g.*, *Edward Greenband Enters. of Ariz. v. Pepper*, 112 Ariz. 115, 117, 538 P.2d 389, 391 (1975) ("an action for fraud is lost if the injured party, after acquiring knowledge of the fraud, manifests to the other party an intention to affirm the contract").

Having received further briefing and oral argument, the waiver defense (and whether waiver as to Coughlin insulates Blue Brick) need not be addressed as such. The parties' additional briefs raise a more direct argument regarding whether M&I satisfied its own obligations under the settlement services agreement. The answer to that question, discussed next, sufficiently resolves M&I's motion. The Court therefore will not address waiver.[4]

### B. M&I's Performance Under the Settlement Services Agreement
#### 1. General Contract Principles Under Nevada Law

Nevada law governs the settlement services agreement.[5] (Doc. 154 at 48.) In Nevada, breach of contract requires the plaintiff to prove four elements: "(1) formation of a valid contract; (2) performance or excuse of performance by the plaintiff; (3) material breach by the defendant; and (4) damages." *Laguerre v. Nev. Sys. of Higher Educ.*, ___ F. Supp. 2d ___, ___, 2011 WL 3444202, at *3 (D. Nev. Aug. 5, 2011) (*citing Bernard v. Rockhill Dev. Co.*, 103 Nev. 132, 135, 734 P.2d 1238, 1240 (1987)).

To the extent a contract needs interpretation, such interpretation is a question of law. *May v. Anderson*, 121 Nev. 668, 672, 119 P.3d 1254, 1257 (2005). The Court's task is to interpret the contract to give effect to the intent of the parties. *Sheehan & Sheehan v. Nelson Malley & Co.*, 121 Nev. 481, 488, 117 P.3d 219, 224 (2005). "When a contract is clear on its face, it will be construed from the written language and enforced

---

[4] This disposition moots M&I's argument that Blue Brick should not be permitted to pursue this waiver theory because it allegedly failed to disclose it until the Court called for supplemental briefing.

[5] Both sides' briefs overlooked this point, citing Arizona law instead.

- 6 -

as written." *Canfora v. Coast Hotels & Casinos, Inc.*, 121 Nev. 771, 776, 121 P.3d 599, 603 (2005) (internal quotation marks omitted). The contract should be construed as a whole, so that all of the provisions are considered together and, to the extent practicable, reconciled and harmonized. *Eversole v. Sunrise Villas Homeowners*, 112 Nev. 1255, 1260, 925 P.2d 505, 509 (1996).

### 2. M&I's Failure to Demonstrate Performance Under the Cure & Repurchase Provision

As noted, M&I interprets the warranty clause as applying to Blue Brick for any dishonesty it conveyed to M&I, knowingly or otherwise. But assuming this interpretation to be correct, M&I's cause of action fails because it has not demonstrated its own "performance or excuse of performance." *Laguerre*, ___ F. Supp. 2d at ___, 2011 WL 3444202, at *3. The settlement services agreement specifies that "[u]pon discovery . . . of a breach of any of the representations and warranties set forth" — including the warranty clause — "the party discovering such breach shall give prompt written notice to the other party," giving the other party thirty days to "cure, in all material respects, any such breach or defect." (Doc. 154 at 46.) Under these terms, M&I's performance depended on "prompt written notice" before it could sue Blue Brick for breach of the warranty (or, more precisely, for breach of the agreement to repurchase, which becomes effective upon breach of the warranty clause and failure to timely cure). M&I has not demonstrated such prompt notice.

On April 3, 2008, M&I learned that Coughlin falsified his tax information. Under M&I's own interpretation of the warranty clause, it therefore knew by April 3, 2008 that Blue Brick had breached its warranty. But M&I did not notify Blue Brick until September 2008 — about five months later. As a matter of law, five months is not "prompt written notice." "Prompt" is commonly defined as "ready and quick to act as occasion demands: responding instantly . . . given without delay or hesitation." *Webster's Third New International Dictionary* 1816 (Philip Babcock Gove ed., 1971). Nothing in the agreement suggests that M&I's five-month investigation of Coughlin and

of the other loans brokered by Blue Brick somehow changes the definition of "prompt" or otherwise excuses performance. The agreement simply says "prompt written notice," and M&I did not perform.

The parties have disputed whether the five-month delay prejudiced Blue Brick. Blue Brick claims that its chances of curing were much higher in April 2008 than in September 2008 or later (given the deterioration of the real estate market over that summer) and M&I protests that such a theory had never been raised until now, after discovery has closed. However, in Nevada, M&I has the burden of proving its performance, *Laguerre*, ___ F. Supp. 2d at ___, 2011 WL 3444202, at *3 — it is not Blue Brick's burden to establish lack of performance and some sort of prejudice.

### 3. The Inseparability of the Cure and Repurchase Provision and the Warranty Clause

Even if Blue Brick had some sort of burden to establish prejudice, the failure of prompt written notice alone is such prejudice — at least under the interpretation that M&I insists upon. M&I claims that the warranty clause effectively makes Blue Brick an unconditional guarantor of the borrower, strictly liable for the outstanding amount of the loan if a single falsehood passes through it to M&I, even a falsehood Blue Brick could not have discovered. In exchange for giving M&I such a powerful remedy, Blue Brick received the cure and repurchase provision — an allocation of the right to attempt to fix the problem without having to pay off the loan. Given the momentous consequences of breaching the warranty clause, the benefit of Blue Brick's bargain can only be achieved through M&I's strict compliance with the "prompt written notice" requirement. Blue Brick need not prove what might have happened had notice been given earlier.

M&I nonetheless contends that the only relevant portion of the contract is the warranty clause — or, more specifically, that breach of the warranty clause is sufficient in itself to give rise to a claim for damages, regardless of the cure and repurchase provision. This interpretation is untenable because it makes the cure and repurchase provision meaningless. "It is a well established principle of contract law . . . that where

1  two interpretations of a contract provision are possible, a court will prefer the
2  interpretation which gives meaning to both provisions rather than an interpretation which
3  renders one of the provisions meaningless." *Quirrion v. Sherman*, 109 Nev. 62, 65, 846
4  P.2d 1051, 1053 (1993). The cure and repurchase provision explicitly announces itself as
5  the procedure to follow if the warranty clause has been breached, and as noted, it is an
6  imperative procedure because it gives the broker an opportunity to resolve the situation
7  before becoming obligated to repurchase the loan. If M&I could disregard it and sue
8  solely for breach of the warranty clause, it is tantamount to saying that the cure and
9  repurchase provision is optional, and therefore meaningless, depriving the broker of an
10 important part of its bargain. Nevada law does not permit such an interpretation.

11 The indemnification clause likewise cannot give M&I an independent right to sue
12 for breach of the warranty clause without complying with the cure and repurchase
13 provision. The indemnification clause says that the broker must indemnify M&I for any
14 losses resulting from "Broker's breach of any representation, warranty or covenant
15 contained in this Agreement" and provides that the indemnification obligation is "[i]n
16 addition to the cure and repurchase obligations." (*Id*. at 47.) But the "in addition"
17 language cannot be interpreted to make the cure and repurchase provision optional. The
18 contract would then become illusory, holding the broker to its obligations whether or not
19 M&I fulfilled its obligations. Accordingly, the contract does not permit M&I to seek
20 damages for breach of the warranty clause without fulfilling the "prompt written notice"
21 requirement in the cure and repurchase provision.

22 M&I's failure to provide prompt written notice was a failure to perform, thus
23 negating an essential element of its breach of contract and warranty causes of action.
24 Blue Brick did not move for summary judgment, but through further briefing and oral
25 argument, this Court provided M&I and Blue Brick "notice and a reasonable time to
26 respond" to the arguments forming the basis of this disposition. Fed. R. Civ. P. 56(f).
27 Thus, summary judgment in Blue Brick's favor will be granted on those causes of action.
28 *See id*.

### III. OUTSTANDING MOTIONS IN LIMINE

M&I's two outstanding motions in limine both seek to exclude any sort of evidence that M&I might have caused its own injuries through loose underwriting practices or irresponsible lending generally. Such evidence may be relevant at least to pure negligence causes of action. M&I has asserted negligence against Blue Brick and Lawyers Title, and those causes of action remain unresolved. If M&I drops those causes of action, the Court may revisit this issue. Accordingly, M&I's motions in limine will be denied without prejudice.

IT IS THEREFORE ORDERED that Plaintiff M&I Bank's motion for partial summary judgment (Doc. 152) is DENIED with respect to its third and fourth causes of action.

IT IS FURTHER ORDERED that summary judgment is GRANTED in favor of Defendant Blue Brick Financial and against Plaintiff M&I Bank with respect to M&I Bank's third and fourth causes of action.

IT IS FURTHER ORDERED that "Plaintiff's Motion in Limine to Exclude All Information, Statements, Purported Evidence of Any Kind That: (1) Plaintiff's Origination, Including Underwriting and its Lending Processes Was the Cause of the Loss; (2) Any Derogatory Comments Concerning the Loan Type or Product; and (3) the Defense of Contributory And/or Comparative Fault" (Doc. 105) and "Plaintiff's Motion in Limine to Exclude the Report and Testimony of Michael Yancey" (Doc. 106) are DENIED without prejudice.

Dated this 24th day of February, 2012.

_____
Neil V. Wake
United States District Judge